FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 18, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| AARON GRUETER; MARK POREMAN; ALLAN LIGI; KENNETH CASCARELLA; ANDREW POKLADOWSKI; INWOOD CAPITAL PARTNERS LLC; SANDRA MCALLISTER; THOMAS DOBRON; LESLIE SCHULTZ; MICHAEL PESICK; and THOMAS BENNETT, | NO. 2:23-CV-0227-TOR<br><br>ORDER GRANTING CCG TRADING'S MOTION TO DISMISS |

              Plaintiffs,

    v.

WITHERSPOON BRAJCICH
MCPHEE PLLC; and PETER
EDWIN MOYE,

              Defendants.

_____

WITHERSPOON BRAJCICH
MCPHEE PLLC; and PETER
EDWIN MOYE,

           Third-Party Plaintiffs,

    v.

1   CCG TRADING, INC.,

2               Third-Party Defendant.

3        BEFORE THE COURT is Third-Party Defendant CCG Trading, Inc.'s

4   Motion to Dismiss (ECF No. 40).  The matter was submitted for consideration

5   without oral argument.  The Court has reviewed the record and files herein and is

6   fully informed.  For the reasons discussed below, CCG's motion to dismiss (ECF

7   No. 40) is **GRANTED**.

8                        **BACKGROUND**

9        This case arises out of a failed transaction for medical equipment.  The issue

10  before the Court is whether to grant CCG Trading's motion to dismiss, which

11  alleges that the Court lacks personal jurisdiction over CCG and that the third-party

12  complaint fails to state a claim upon which relief may be granted.

13       CCG is a medical supply company that imports equipment from Malaysia

14  and China into California and various East Coast ports.  ECF Nos. 42 at 4, ¶¶ 3-9;

15  24 at 11, ¶ 3.  CCG is incorporated in Wyoming and maintains offices in California

16  and Malaysia.  ECF No. 42 at 4, ¶¶ 4-5.

17       H-Source Distribution-U.S., Inc. was a Washington e-commerce medical

18  distribution company that was administratively dissolved in February 2023 after

19  filing for Chapter 7 bankruptcy.  ECF Nos. 2 at 4, ¶ 25; 50-1 at 2.  In early 2021,

20  H-Source became acquainted with CCG through Robert Sudon, a Californian and

1    independent broker.  ECF No. 42 at 5, ¶ 13.  H-Source represented that it was

2    interested in obtaining personal protection equipment (PPE) from CCG.  ECF No.

3    49 at 2, ¶ 6.  On August 13, 2021, after several rounds of virtual meetings, phone

4    calls, and e-mail negotiations, H-Source and CCG executed a formal supply

5    agreement, under which H-Source agreed to purchase 6 million boxes of

6    Malaysian-manufactured nitrile examination gloves from CCG, to be shipped in

7    installments of 500,000 boxes per month over the course of 12 months.  ECF Nos.

8    42 at 5, ¶ 13; 48 at 2, ¶ 5; *see* ECF No. 42-1 at 4.  The agreement provided that the

9    gloves would be shipped "delivery duty paid" to Los Angeles, California, where

10   H-Source would retrieve it from a warehouse.  ECF No. 41 at 4.  H-Source was

11   represented by attorney Peter Moye of Witherspoon Brajcich McPhee PLLC

12   ("WBM") throughout these dealings.  *See generally* ECF Nos. 2; 24.  WBM is a

13   Spokane law firm.  *Id.*

14       In October 2021, the parties signed an addendum agreement which revoked

15   their first supply agreement and created a second supply agreement and escrow

16   agreement.  ECF No. 47 at 3; *see also* ECF No. 49-3.  The second sale agreement

17   was substantially the same as the first, but required the parties to complete a trial

18   order and sale as a condition precedent to the fulfillment of the parties' full

19   agreement for the sale of 6 million boxes of gloves.  ECF Nos. 1 at 5, ¶ 31; 47 at 3.

20   Specifically, H-Source agreed that it would deposit money into an escrow account

1    in exchange for a trial shipment of 250,000 boxes of gloves.  ECF No. 49-3 at 3.

2    The parties agreed that if H-Source rejected the trial order, the second supply

3    agreement would be canceled and the money in escrow would be returned.  ECF

4    No. 47 at 5.  Both agreements provided they were to be "governed by and

5    construed in accordance with the laws of Wyoming."  ECF No. 49-2 at 7; *see also*

6    ECF No. 49-3 at 4.

7        The agreement required H-Source to maintain an escrow account with an

8    international trading bank.  ECF Nos. 42 at 5, ¶ 15; 42-1 at 8.  The parties

9    identified Emerio Banque Ltd., a United Kingdom financial institution, as the

10   escrow agent and Nouam Financial Consultants PVT Ltd., an India corporation, as

11   the financier.  ECF No. 49-1 at 2.  As explained by CCG's head Commercial

12   officer, the purpose of identifying a financier and opening an escrow account was

13   so that CCG could pay manufacturing and logistics costs up front "without

14   encumbering H-Source funds."  ECF No. 2-2 at 2 (italics deleted).  CCG

15   introduced Nouam Financial to H-Source as a potential financier, but did not

16   require H-Source to use Nouam or any other specific institution for its financing.

17   ECF No. 51 at 4, ¶ 6.  H-Source's corporate counsel, Mr. Moye, had signatory

18   control for the release of any escrow funds.  ECF No. 2-2 at 2.

19       Nouam required H-Source to place 1 million U.S. dollars in escrow as

20   contract security for the trial transaction.  ECF No. 48 at 2, ¶ 7.  With the

assistance of its legal counsel, H-Source identified various individual investors who were willing to fund the venture.  ECF No. 2 at 5, ¶ 29.  Those investors executed a separate Investors Agreement on October 21, 2021.  ECF No. 2 at 7, ¶¶ 41-42.

The escrow agreement did not outline how or where H-Source should deposit the funds.  ECF No. 2 at 6, ¶ 35(a).  On October 19, 2021, CCG directly instructed H-Source to wire the money to a Florida bank account named "Atari Interactive Inc."  ECF No. 2-2 at 3.  When H-Source responded with confusion over whether the wire instructions were correct, CCG assured H-Source that they were and explained, "Nouam has over USD160M on deposit at Chase and Emerio banks, and the deposit to this account is their requirement to provide CCG Trading our financing."  ECF No. 2-2 at 2.

Following this correspondence, the H-Source investors individually wired their money to the Atari Interactive account.  ECF No. 2 at 8, ¶ 45.  The same day, Kenneth Jackson, the head of Compliance at Emerio Banque, e-mailed officers at Nouam and stated that Atari could not accept wires from individual persons who were not signatories to the escrow agreement between Nouam, H-Source, and CCG.  ECF No. 2-3 at 2-3.  Emerio Banque requested that all individuals cancel their wires and that H-Source resend the money.  *Id.* at 3.  On October 27, 2021, CCG forwarded the e-mail from Emerio Banque to Mr. Moye and advised that

1   "[t]ime [was] of the essence" in fixing the error.  *Id.* at 2.  The following day, Mr.

2   Moye wrote to Emerio Banque and represented that the investors were in the

3   process of canceling the pending transfers and that "[o]nce the funds are returned, I

4   will resend funds from H-Source directly."  ECF No. 2-4 at 3.

5        Following the cancellation of the initial wire transfers, H-Source, together

6   with Mr. Moye, decided to utilize WBM's Interest on Lawyers' Trust Accounts

7   (IOLTA) at Washington Trust Bank in Spokane, Washington, to hold the wire

8   funds from individual investors so the money could be remitted directly from H-

9   Source to the escrow account.  ECF No. 2 at 8-9, ¶ 49.  In November, Nouam

10  directed CCG to send the funds from H-Source to a New York bank account

11  named "Atari AlphaVerse CBI."  ECF No. 42 at 5, ¶ 16.  CCG forwarded the

12  instructions to H-Source, and Mr. Moye duly wired the money from the IOLTA

13  account.  ECF No. 2-5 at 2.

14       The trial transaction failed, apparently due to the glove manufacturer

15  rejecting a faulty check by Nouam.  ECF Nos. 47 at 5-6; *see also* 2-6 at 3.  To date,

16  the individual investors—who are Plaintiffs in this action—have been unable to

17  recover their monies.  A letter from Mr. Moye to Emerio Banque and Nouam's

18  legal counsel provides some further context behind why the transaction was

19  unsuccessful:

20       After executing the Escrow Agreement, [H-Source's] investors began
        depositing the $1,000,000 into the authentic Atari account.  In my

conversations with the Atari general counsel, he informed me in no uncertain terms that Atari knew nothing about the transactions between CCG and Nouam and that upon noticing the wire transfers into the Atari account, it prompted them to contact Chase Bank and (1) begin a fraud investigation, and (2) reverse all the wire transfers.

It was at this time that your client directed that all the deposits were to come through my office and be deposited in the fraudulent Atari account, owned by Crypto Blockchain Industries [CBI]. I have attached a copy of the text messages from your client to CCG indicating that they had spoken directly with the Atari executives and that this was the correct account. Those texts are patently false in their representations. As I previously indicated, Mr. Chesnais was fired from Atari in April 2021, and this account was not set up or initiated until after June of 2021.

The transaction failed due to issues surrounding your client's financing of the transaction. Your client did provide what purports to be a cashier's check . . . made payable to [the glove manufacturer]. The check was post-dated to June of 2022 and was worthless as it related to a transaction that was supposed to have been completed in December of 2021[.] . . . You are correct that CCG is holding that check . . . CCG informs me they would be more than happy to return that check on the condition that the $1,000,000 presently held in escrow at Chase Bank be returned to my escrow account.

. . .

Your representation of both Nouam and Emerio Banque further confirms that there is some form of collusion, conspiracy and/or collaboration between Nouam, Emerio Banque and potentially [CBI]. My client has hired counsel in Wyoming . . . and counsel in the United Kingdom in order to protect my client's legal rights and collect the money that is due and owing to them.

ECF No. 2-6 at 3 (dated April 26, 2022).

On August 11, 2023, the individual investors brought claims against Mr. Moye and WBM for (1) negligence, (2) legal malpractice, (3) breach of fiduciary duty, and (4) breach of oral contract.  ECF Nos. 1; 2 at 10-19.  The Court denied Mr. Moye and WBM's motion to dismiss.  ECF No. 21.  On February 12, 2024, Mr. Moye and WBM filed a third-party complaint against CCG.  ECF No. 24.  The complaint denies liability to the individual investors and "incorporate[s]" the investors' claims against CCG, asserting that CCG "was integral to the actions taken by [ ]third-party plaintiffs."  *Id.* at 11, ¶ 6.  Alternatively, the complaint alleges that Mr. Moye and WBM are entitled to statutory contribution or common law indemnification from CCG if found liable.  *Id.* at 12, ¶¶ 9-10.

## DISCUSSION

## I.    Personal Jurisdiction

CCG moves to dismiss Mr. Moye and WBM's third-party complaint for lack of personal jurisdiction under Rule 12(b)(2).  ECF No. 40.  Mr. Moye and WBM argue that the exercise of specific personal jurisdiction is appropriate based on CCG's contacts with Washington residents.  ECF No. 47.

### A.    Rule 12(b)(2) Standard

Under Rule 12(b)(2), a defendant may seek dismissal for lack of personal jurisdiction.  Fed. R. Civ. P. 12(b)(2).  It is the plaintiff's burden to establish that the court has jurisdiction.  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218,

1223 (9th Cir. 2011).  If the motion is based on written materials, the plaintiff only

needs to make a *prima facie* showing of jurisdictional facts.  *Id.*  A plaintiff's

uncontroverted allegations must be accepted as true, and any conflicting statements

contained within the affidavits must be resolved in the plaintiff's favor.  *Id.*

**B.    Personal Jurisdiction Standard**

*In personam* jurisdiction "is the power of a court to enter judgment against a

person." *S.E.C. v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007).  Before entering

judgment against a non-resident defendant in a diversity action, the district court

must confirm that the assertion of personal jurisdiction comports with the Due

Process Clause of the Fourteenth Amendment and the long-arm statute of the state

where the court is seated.  *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th

1079, 1086 (9th Cir. 2023); *see also Daimler AG v. Bauman*, 571 U.S. 117, 125

(2014) ("Federal courts ordinarily follow state law in determining the bounds of

their jurisdiction over persons.") (citing Fed. R. Civ. P. 4(k)(1)(A)).

Washington's long-arm statute, RCW 4.28.185, is coextensive with federal

due process requirements.  *See Electric Mirror, LLC v. Janmar Lighting, Inc.*, 760

F. Supp. 2d 1033, 1035 (W.D. Wash. 2010) (citing *Shute v. Carnival Cruise Lines*,

113 Wash.2d 763, 771 (1989)).  As such, the jurisdictional analysis is identical

under both state and federal law.  *Schwarzenegger v. Fred Martin Motor Co.*, 374

F.3d 797, 801 (2004).  In order to subject a non-resident defendant to an *in*

1  *personam* judgment, due process requires that "he have certain minimum contacts

2  with [the forum State] such that the maintenance of the suit does not offend

3  'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of*

4  *Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)

5  (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

6  "*International Shoe's* conception of 'fair play and substantial justice'

7  presaged the development of two categories of personal jurisdiction": general

8  jurisdiction and specific jurisdiction.  *Daimler*, 571 U.S. at 126.  A defendant

9  subject to general jurisdiction may be "haled into court in the forum state to answer

10  for any of its activities anywhere in the world." *Schwarzenegger*, 374 F.3d at 801.

11  The exercise of general jurisdiction is appropriate when a defendant's "affiliations

12  with the State are so 'continuous and systematic' as to render them essentially at

13  home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564

14  U.S. 915, 919 (2011) (quoting *Int'l Shoe*, 326 U.S. at 317).  "For a corporate

15  defendant, general jurisdiction is paradigmatically appropriate in the state in which

16  the entity is incorporated or where it maintains its principal place of business."

17  *Impossible Foods*, 80 F.4th at 1086 (citing *Daimler*, 571 U.S. at 137).  Relatively

18  speaking, however, "specific jurisdiction has become the centerpiece of modern

19  jurisdiction theory, while general jurisdiction plays a reduced role." *Goodyear*,

20

564 U.S. at 925 (quoting Mary Twitchell, *The Myth of General Jurisdiction*, 101 Harv. L. Rev. 610, 628 (1988)).

Specific jurisdiction, for its part, "covers defendants less intimately connected with the State, but only as to a narrower class of claims." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021).  In determining whether specific jurisdiction may lie, courts scrutinize the defendant's contacts with the forum state for "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  The Ninth Circuit employs a three-step test to decide whether the application of specific jurisdiction satisfies the minimum requirements of due process:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802.  If the plaintiff successfully meets their burden under the first two factors, then the burden shifts to the defendant to make a

1  "compelling case" that the exercise of jurisdiction would be unreasonable under

2  the third factor.  *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (citing

3  *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011)).

4        The first factor includes two related but distinct concepts: "purposeful

5  direction" and "purposeful availment."  *Yahoo! Inc. v. La Ligue Contre Le Racisme*

6  *Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc).  Courts

7  generally implement the purposeful direction test when the defendant's conduct

8  primarily occurs outside the forum state, whereas the purposeful availment scheme

9  is better suited to address "deliberate action within the forum" or where the

10  defendant "has created continuing obligations to forum residents."  *Impossible*

11  *Foods*, 80 F.4th at 1088 (quoting *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir.

12  1995)).  "Thus, 'purposeful availment generally provides a more useful frame of

13  analysis for claims sounding in contract, while purposeful direction is often the

14  better approach for analyzing claims in tort.'"  *Id.* (quoting *Global Commodities*

15  *Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th

16  Cir. 2020) (brackets omitted)); *see also Herbal Brands, Inc. v. Photoplaza, Inc.*, 72

17  F.4th 1085, 1090 (9th Cir. 2023) (adding that the purposeful direction test only

18  applies to intentional torts, not negligence claims) (citations omitted).

19        Either way, both tests are intended to "frame [the court's inquiry] into the

20  defendant's 'purposefulness' vis-à-vis the forum state."  *Id.* at 1089; *see also Davis*

*v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023) ("[W]hen considering specific jurisdiction, courts should comprehensively evaluate the extent of the defendant's contacts with the forum state and those contacts' relationship to the plaintiffs' claims—which may mean looking at both purposeful availment and purposeful direction.").

Purposeful direction is evaluated under a three-part effects test taken from *Calder v. Jones*, 465 U.S. 783 (1984). The *Calder* effects test "requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). The Ninth Circuit defines an "intentional act" as "an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Schwarzenegger*, 374 F.3d at 806. "Th[e] analysis is driven by the defendant's contacts with the forum state—not the plaintiff's or other parties' forum connections." *Davis*, 71 F.4th at 1163; *see also, e.g.*, *Walden v. Fiore*, 571 U.S. 277, 289 (2014) ("Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections.").

Like the purposeful direction test, the purposeful availment inquiry is intended to prevent a defendant from being "haled into a jurisdiction solely as a

result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal citations omitted).  Purposeful availment exists when a defendant "deliberately reache[s] out beyond its home—by, for example, exploiting a market in the forum State or entering a contractual relationship centered there" in order to "purposefully avail itself of the privilege of conducting activities within the forum state." *Ford Motor Co.*, 592 U.S. at 359 (quotation marks and citations omitted).  "Purposeful availment can be established by a contract's negotiations, its terms, its contemplated future consequences, and the parties' actual course of dealing." *Davis*, 71 F.4th at 1163 (citing *Burger King Corp.*, 471 U.S. at 479).

The second of the three factors requires that the claim arise out of the defendant's forum related activities. *Schwarzenegger*, 374 F.3d at 802.  "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, an activity or occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017) (quoting *Goodyear*, 564 U.S. at 919) (brackets omitted).

If the plaintiff meets its burden as to the first two factors, then the burden shifts to the defendant to present "compelling case" as to why the assertion of

specific jurisdiction over a defendant would be unreasonable. *Picot*, 780 F.3d at 1211. A defendant's burden to prove the exercise of jurisdiction would be unreasonable is a "heavy" one, *Dole Food Co.*, 303 F.3d at 1117, and "[m]ost such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional," *Burger King Corp.*, 471 U.S. at 477. In determining whether the exercise of specific jurisdiction comports with fair play and substantial justice, courts weigh the following seven factors:

> (1) [T]he extent of the defendant's purposeful injection into the forum state's affairs;
>
> (2) the burden on the defendant of defending in the forum;
>
> (3) the extent of conflict with the sovereignty of the defendant's state;
>
> (4) the forum state's interest in adjudicating the dispute;
>
> (5) the most efficient judicial resolution of the controversy;
>
> (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and
>
> (7) the existence of an alternative forum.

*Dole Food Co.*, 303 F.3d at 1114. Relatedly, these factors may also "sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King Corp.*, 471 U.S. at 477.

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

### C.   Personal Jurisdiction Analysis

The burden rests with Mr. Moye and WBM as third-party plaintiffs (hereinafter "Plaintiffs") to establish that driving CCG into a Washington forum accords with due process principles.  Plaintiffs do not refute that CCG, a Wyoming corporation with offices in California and Malaysia, cannot be subject to general jurisdiction in the State of Washington.  *See* ECF Nos. 41 at 11; 47 at 7; *see also Daimler*, 571 U.S. at 137 (general jurisdiction is appropriate in the state where the entity is incorporated or maintains its principal place of business).  The Court therefore proceeds to consider whether the application of specific jurisdiction is proper.

The parties' specific jurisdiction arguments primarily train on the concept of purposeful availment.  *See* ECF No. 47 at 8-9.  The Court agrees that the application of purposeful availment test is appropriate, given that Plaintiffs' claims arise out of their contractual relationship with CCG.  *See Impossible Foods*, 80 F.4th at 1088 (holding that purposeful availment provides the appropriate frame of analysis for claims sounding in contract).

Plaintiffs contend that CCG purposefully availed itself of the privilege of conducting its business within Washington State by: (1) contracting with H-Source, a Washington corporation; (2) accepting wire transfers from Washington investors through an IOLTA formed by a Washington bank and managed by a

1    Washington law firm; and (3) agreeing to contract terms that would repeat these

2    transactions twelve times over the course of a year if the trial transaction proved

3    successful.  ECF No. 47 at 9-10.  CCG rebuts this analysis, characterizing the

4    events of the failed transaction as "a single, isolated business excursion . . .

5    solicited by a resident of this state."  ECF No. 51 at 2.

6          The Court agrees with CCG that Plaintiffs have not met their burden to

7    establish purposeful availment.  CCG did not maintain an office in Washington,

8    travel to Washington, advertise its services in Washington, or solicit Washington

9    clientele.  ECF No. 42 at 4, ¶ 7-8, 11.  It was H-Source, not CCG, who pursued a

10   commercial relationship.  *Id.* at 5, ¶ 13.  H-Source was not exposed to any in-state

11   advertisements marketing CCG's services, but instead learned of the company

12   through an independent California broker.  *Id.*  And CCG's relationship to

13   Plaintiffs, as the legal representatives of H-Source, and the individual investors, is

14   even more attenuated: CCG had no role in selecting H-Source's legal counsel or

15   identifying investors who could finance H-Source's trial purchase.  ECF No. 3 at, ¶

16   3 (noting investors were sourced by H-Source and its CEO).  In sum, CCG's

17   contacts with Washington residents and entities were the result of H-Source's

18   unilateral efforts.  *See Burger King Corp.*, 471 U.S. at 475 (holding that personal

19   jurisdiction cannot be supported by purely random, fortuitous, or attenuated

20   contacts, or by the unilateral activity of another party).  Neither does the fact that

CCG happened to be in contact with multiple Washington residents and entities while working on this transaction render this matter suitable for disposition in a Washington forum.  As the Supreme Court has repeatedly explained, "[T]he plaintiff cannot be the only link between the defendant and the forum."  *Walden*, 571 U.S. at 285.  Thus, the Court cannot say that CCG reached out beyond its home forum to avail itself of the privilege of conducting activities within Washington.

Likewise, the Court does not believe it significant that Plaintiffs held the investors' money in an IOLTA at Washington Trust Bank.  CCG did not require Plaintiffs to utilize their trust account, or any Washington bank account, for that matter.  Indeed, even Nouam did not specify that Plaintiff needed to make a wire transfer from a Washington account.  These facts tends to cut against any argument that Washington entities or banking regulations played a significant role in CCG's agreement to take part in the transaction.

Finally, the nature of the contract does not support the exercise of jurisdiction over CCG.  Plaintiffs rely on the fact that the contract intended for the parties to engage in a continuous course of dealing if the trial transaction proved successful.  ECF No. 47 at 14.  But a contract's "contemplated future consequences" is not the only relevant consideration the Court takes into account when undertaking a jurisdictional analysis.  The Court must also look to "a

1   contract's negotiations, its terms . . . and the parties' actual course of dealing."

2   *Davis*, 71 F.4th at 1163.  As described above, the parties' negotiations,

3   communications, and transfers of capital were fully remote.  *Id.* at 1165

4   ("[R]emote actions taken to service a contract in the forum state seldom lead to

5   purposeful availment by themselves.").  More importantly, the actual terms of the

6   agreement place no special emphasis on Washington.  To the contrary, the

7   agreement provided that the goods would be shipped from Malaysia to Los

8   Angeles, California, where H-Source would be required to pick it up from a

9   warehouse.  *See, e.g.*, ECF No. 49-3 at 3.  Each iteration of the agreement also

10  provided that it would be governed under Wyoming choice of law.  ECF No. 42 at

11  4, ¶ 10.  As such, the contract itself does not support a Washington court's exercise

12  of jurisdiction over CCG.

13       Plaintiffs argue in the alternative that the purposeful direction test supports

14  personal jurisdiction.  ECF No. 47 at 14.  Even if this test were applicable, there is

15  no evidence CCG's actions were expressly aimed at Washington.  *Dole Food Co.*,

16  303 F.3d at 1111 (noting the *Calder* effects test requires the defendant to undertake

17  an intentional act "expressly aimed at the forum state").  CCG did not advertise its

18  services in Washington or seek clients there.  In the main, CCG's chief

19  responsibility was to deliver products from Malaysia to a California port.  What

20  happened after that point was H-Source's prerogative.  It is not sufficient that H-

ORDER GRANTING CCG TRADING'S MOTION TO DISMISS ~ 19

Source or Plaintiffs contemplated the products CCG shipped would eventually end up in Washington's stream of commerce; rather, the relevant question is what actions CCG undertook connecting it to the forum. *Asahi Metal Indus. Co., Ltd. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 112 (1987) ("[A] defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State."). Because CCG did not direct its activities towards Washington, the Court finds there was no purposeful direction. Accordingly, the Court lacks personal jurisdiction over CCG and cannot adjudicate Plaintiffs' third-party claims. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("Personal jurisdiction . . . is 'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to adjudication.'") (quoting *Emps. Reinsurance Corp. v. Bryant*, 299 U.S. 374, 382 (1937)).[1]

//

//

---

[1] Having concluded it lacks personal jurisdiction, the Court declines to reach the question of whether Plaintiffs' third-party complaint should also be dismissed pursuant to Rule 12(b)(6).

## II.    Dismissal or Transfer

Plaintiffs and CCG did not address the issue over whether a potential transfer might be appropriate.  Under 28 U.S.C. § 1631, a court which lacks personal or subject-matter jurisdiction must transfer the action to another court "if it is in the interest[s] of justice."  Specifically:

> Whenever a civil action is filed in a court as defined in section 610 of this title . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

28 U.S.C. § 1631.

The circuit courts are divided over whether § 1631's reference to a court's "want of jurisdiction" extends to the concept of personal jurisdiction.  15 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3842 (4th ed. June 2024 update).  The Ninth Circuit has held that a district court abuses its discretion in failing to determine whether a transfer under § 1631 is warranted upon a finding that it lacks personal jurisdiction.  *See Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990) ("A district court's failure to exercise discretion [under § 1631] constitutes an abuse of discretion."); *see also Tackett v. Montana Dep't of Pub. Health & Hum. Servs.*, No. 22-35326, 2024 WL 2826223, at *2 (9th Cir. June

4, 2024) (holding that the district court in Montana should have transferred claims

to this Court under § 1631 upon finding that it lacked personal jurisdiction).

Despite the mandatory language of § 1631, it is customary for a plaintiff to

specify in its written motion that it seeks transfer as an alternative to dismissal.

*See, e.g.*, *Emery v. Bioport Corp.*, No. 06-CV-0008-AAM, 2006 WL 3147399, at

*5 (E.D. Wash. Oct. 31, 2006) ("Oftentimes, a plaintiff makes a motion to transfer

as an alternative to complete dismissal.").  When a plaintiff opposes transfer and

would prefer dismissal of the case, the Court will not transfer the action, even if

transfer otherwise appears "in the interest of justice."  *Id.* (dismissing the case

where the plaintiff indicated it opposed transfer).

Here, Plaintiffs did not indicate whether they prefer transfer as an alternative

to dismissal.  The Court is uncertain whether this was a deliberate maneuver, as in

*Emery*, or an oversight.  As such, for the time being, the Court will dismiss

Plaintiffs' claims.  If Plaintiffs desire an Order of Transfer to the United States

District Court for the District of Wyoming pursuant to 28 U.S.C. § 1631, they shall

file a written motion requesting the same within fourteen (14) days from the entry

of this Court's Order of Dismissal.

//

//

//

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Third-Party Defendant CCG Trading's Motion to Dismiss (ECF No. 40) is **GRANTED**.  Third-Party Plaintiffs WBM and Peter Moyes' Complaint (ECF No. 24) is **DISMISSED WITHOUT PREJUDICE**.

2. If Third-Party Plaintiffs seek transfer of their claims, they must file a written motion requesting the same within **fourteen (14) days** from the entry of this Order.

The District Court Executive is directed to enter this Order, furnish copies to counsel, and terminate from the docket Third-Party Defendant CCG Trading.  The file remains **OPEN**.

DATED **June 18, 2024**.



THOMAS O. RICE
United States District Judge